Gershengorn, J.
INTRODUCTION
This matter comes before the court on third party plaintiffs’ motion for summary judgment. Third party plaintiffs, Lincoln Street Realty and Greater Worcester Cablevision (Lincoln/Cablevision),[3] intervenors in the case in chief, seek declaratory relief requesting that the exclusivity clause in a television service contract between Lincoln and Amsat be declared null and void. Third party plaintiffs further request that this court declare that neither Cablevision nor Lincoln Street Realty be liable to Amsat for damages due to breach of contract or contractual interference as a result of the voiding of the exclusivity clause for service in the contract.[3] For the reasons set forth below, third party plaintiffs’ motion is ALLOWED.
BACKGROUND
The following facts are not in dispute. Amsat is a satellite master antenna (SMATV) company which provides satellite television services to various residential complexes. On May 13, 1993, plaintiff/third party defendant Amsat (Amsat) filed the case in chief against defendants Colonial Point Realty (Colonial) and Car-abetta Enterprises, Inc. (Carabetta). In this original action, Amsat alleged that Colonial Point, a residential apartment complex located in Wakefield, Massachusetts, and Carabetta, the real estate manager for the premises, breached the terms of a written agreement *500 where Amsat was granted the exclusive right to provide television services to the tenants of Colonial Point.
In the case in chief, Amsat claimed that Colonial/Carabetta had entered into an agreement by which a rival cable system, Colonial Point Cable, was delivering cable television to the residents of Colonial Point, in violation of the exclusive agreement with Amsat. Colonial/Carabetta claimed in response that the agreement had been terminated by them. In any event, Colonial/Carabetta argued that the exclusivity of service provision in the agreement was unenforceable as against public policy in light of G.L.c. 166A, §22, a Massachusetts statute that permits mandatory access by cable companies to tenants of residential complexes who so request, provided the cable company is in compliance with the terms of the statute.
On August 11, 1994, the court allowed third party plaintiffs Lincoln Street Realty and Greater Worcester Cablevision’s motion to intervene. The third party complaint alleges that in November of 1984 Lincoln Street Really (Lincoln) and Amsat entered into a written agreement virtually identical to the one executed between Amsat and Colonial Point in the case in chief. This agreement also included an exclusivity of service provision, granting Amsat the exclusive right to provide television programming to the residents of Lincoln Village, a development owned by the Lincoln Street Realty and located in Worcester, Massachusetts. In exchange for the exclusivity agreement, Amsat agreed to pay royalties to Lincoln. Section 15 of the Agreement between Amsat and Lincoln provides as follows, in pertinent part:
In consideration of the substantial costs and expenses incurable by Operator (Amsat) under this Agreement . . . Owner (Lincoln) warrants that no other pay or cable television programming, other cable-related service of any kind .. . will be distributed or permitted to operate in, at, on, or about the Property during the time of this agreement. . .
Like Colonial Point in the case in chief, Lincoln/Cablevision assert that the service agreement with Amsat had been terminated between the parties. In any event, however, they contend that the exclusivity of service provision is void and unenforceable in light of G.L.c. 166A, §22.
Greater Worcester Cablevision owns and operates a community antenna television (CATV) system in Worcester, Massachusetts. Cablevision is licensed pursuant to G.L.c. 166A, §3 to provide cable television service in Worcester. Cablevision now seeks access to Lincoln Village, and has notified Lincoln Realty of its intent to provide service to those tenants who had so requested, in accordance with 166A, §22.
Amsat disputes Cablevision’s right to provide cable television services to the tenants of Lincoln Village, claiming that under its agreement with Lincoln, Amsat holds any and all rights to provide such service. In response Cablevision and Lincoln intervened in the case in chief, seeking a declaratory judgment that the provision is void and unenforceable, and that any claim for indemnity by Amsat as to Cablevision or Lincoln Street Realty for lost revenue or contractual interference be rejected.
Amsat opposes summary judgement on the basis that there is a question of material fact as to whether a contract exists between the parties, and that Amsat should be compensated either through the contract or via the compensation provisions of G.L.c. 166A, §22 for any interference with Amsat’s contractual rights.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact, and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue. Pederson v. Time, 404 Mass. 14, 16-17 (1989). The nonmoving party’s failure to prove an essential element of its case mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991) (citing Celotex v. Catrett, 477 U.S. 317, 322 (1986)). The nonmoving party cannot defeat the motion for summary judgment by resting on its pleadings and mere assertions of disputed fact. Lalonde v. Eissner, 405 Mass. 207, 209 (1989). Once the moving party has established the absence of a triable issue, the party opposing summary judgment must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, supra at 17.
A. Issue of Fact
Third party defendant, Amsat, claims that whether or not the contract between Amsat and Lincoln has been terminated is a question of material fact, and therefore precludes summary judgment from being entered. For the purposes of determining the validity of the exclusivity of service provision however, Lincoln/Cablevision concedes that the contract exists. There is no disputed issue of material fact.
B. Issues of Law
In order for summary judgment to be entered in favor of Lincoln/Cablevision it must be concluded that the record entities the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 19, 422 (1983).
1. Validity of Exclusivity of Service Provision
General Law c. 166A provides a comprehensive framework for the regulation of cable television in Massachusetts. Waltham Tele-Communications v. O’Brien, 403 Mass. 747, 749 (1989). Section 22 establishes the right of CATV operators to install system facilities at multiple dwelling units if one or more *501 tenants has so requested.[4] This statute has been referred to as a “mandatory access” statute.
The validity of Section 22 has been the subject of litigation on two occasions. In 1985 it was declared unconstitutional on the basis that it did not provide just compensation to landlords for the installation of cable on their property, a regulatory taking. Greater Worcester Cablevision v. Carabetta, 682 F.Supp. 1248, 1252 (D.Mass. 1985). The District Court found that Section 22 “unquestionably . . . authorizes taking of property compensable under the Fifth and Fourteenth Amendments by obliging landlords to permit cable operators to install cable equipment on their property. Id. at 1244. Direct physical attachment of plates, boxes, wires and bolts to a building was a permanent physical occupation of the building, interfering with the owner’s right to possess and use his property. Id. (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 438 (1982)). In light of the fact that in 1985 Section 22 failed to provide for just compensation to the landlord caused by the permitted physical occupation by cable operators, the statute was declared unconstitutional.
The statute was then amended in order to provide for just compensation. In 1989 the statute was again struck down for failing to provide a jury determination of just compensation. Waltham Tele-Communication v. O’Brien, 403 Mass. 747 (1989). The statute in its present form provides for a jury determination of just compensation in accordance with G.L.c. 79, Eminent Domain and Betterments.
It is clear that Section 22 provides that access by CATV operators be permitted where the operator agrees to be bound by the terms of the section. In determining the validity of Section 22, the United States District Court for the District of Massachusetts discussed the policy behind the statute. The purpose in permitting competitive access to multi-unit dwellings was to prevent landlords from blocking cable operators’ access to their properly so they could maintain a royalty arrangement with SMATV systems, like Amsat, and receive payments for delivering a captive audience. Greater Worcester Cablevision, supra at 1252. The District Court cited to a House Committee on Energy and Commerce report in noting that SMATVs, which are not franchised and subject to franchise fees or federal regulation like CATV systems, are more likely to enter into royalty arrangements with landlords and owners. Such arrangements result in landlords and property owners being positioned as information gatekeepers, deciding what electronic information passes to the tenants. Id. at 1253 (citations omitted).[5]
When a court determines that a contract violates public policy, or is contrary to the law, it has discretion to determine the rights and liabilities of the parties as a matter of law. Massachusetts Municipal Wholesale Electric Co. v. Danvers, 411 Mass. 39, 55 (1991). The court may decline to enforce the contract, or may determine that any obligations that have arisen under it should not be enforced. Id. Any such determination should be linked to the considerations of fairness and public policy that justify such a judicial remedy. Id.; Town Planning & Engineering Assoc., Inc. v. Amesbury Speciality Co., 369 Mass. 737, 746 (1976) (cautioning against imposing undue sanctions where a contract is violative of a statute).
The provision of the contract at issue, providing for exclusivity of television programming by Amsat, is directly in contravention of the policy purpose behind the Massachusetts mandatory access statute. The mandatory access provisions of the statute have withstood two rounds of litigation. If the Legislature had intended a different outcome, they would have removed the mandatory access provision instead of providing measures for compensation. What the legislature had in mind was competition[6] between servic-ers to allow tenants in apartment complexes to receive the best and most efficient service of their choice, not the service choice of the landlord.[7]
For the above reasons, the exclusivity provision in the contract between Amsat and Lincoln is void and unenforceable as contrary to the intent and purpose of the mandatory access statute of G.L.c. 166A, §22.[8] Greater Worcester Cablevision has a right of access to the premises of Lincoln Village pursuant to G.L.c. 166A, §22.
2. Compensation Issue
Amsat also claims that it should be compensated for any loss or interference with its exclusive contractual rights pursuant to both the statute and the contract. This claim, as it relates to the interference with Amsat’s exclusive right to provide television services, is not compensable because it is not a taking of property under the Fifth and Fourteenth Amendment.[9]
Although Amsat has not provided this court with guidance or legal support to its position, the thrust of Amsat’s argument is that any interference with Amsat’s contractual exclusivity rights as the result of G.L.c. 166A §22’s mandatory access provisions is a regulatory taking of property, and compensable under the terms of the statute. Amsat does not claim that the statute is invalid. Therefore, they argue they should be indemnified for the loss of revenues by either Lincoln, or the competing operator, in this case Cablevision.
Amsat cites as the sole support to its position the provision of G.L.c. 166A §22 which reads, “An owner whose property is injuriously affected or diminished in value by occupation of the ground or air or otherwise by such construction of CATV system facilities may recover damages therefor from the operator pursuant to chapter 79 (Eminent Domain and Betterments).” Section 22 paragraph seven.
*502 Amsat contends that as an “owner” of contractual rights of service, it is deserving of compensation for the displacement of those rights by the statute. The term “owner” as it is used in the statute, however, refers to the “owner of such real estate” who may require compensation for the physical occupation of the cable installation as stated in the fourth paragraph of Section 22. Moreover, prior to the amendment in 1991, paragraph seven previously read “If the owner of such multiple dwelling units intends to require the payment of a sum in excess of one dollar . . .” The earlier version of paragraph seven provided a complicated scheme of just compensation that was replaced in 1991 with the compensation scheme of chapter 79.
Finally, in the section to which Amsat cites, a careful reading reveals that the statute provides compensation for the property’s diminution in value by “occupation of the ground or air by such construction!’ of CATV facilities. G.L.c. 166A§22 (emphasis added). This wording indicates that compensation is due to the owner of such property which is physically occupied by the actual construction of the CATV facilities. Such a reading of the statute convinces this court that compensation is not available to the “owner” of an exclusivity of service contract for contractual interference.
A brief analysis of “takings” law leads the court to the same conclusion: that the voiding of the exclusivity provision as a result of Section 22 is not a compensa-ble taking.
The concept of “taking” within the meaning of the Fifth Amendment is not precisely defined.[10] The United States Supreme Court has defined two types of regulatory actions that constitute compensable takings per se, without regard to other considerations. Steinbergh v. Cambridge, 413 Mass. 736, 741 (1992), cert. denied, 113 S.Ct. 2338 (1993); McAndrews v. Fleet Bank of Massachusetts, 989 F.2d 13, 19 n.7 (1st Civ. 1993). The first is a direct, physical intrusion into the property. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 432-33 n.9 (1982). A second type of per se regulatory taking is a regulation which denies all economically beneficial or productive use of the interest in property. Lucas v. South Carolina Coastal Council, 112 S.Ct. 2886, 2893 (1992). The situation at hand falls into neither category.
While contractual rights may be considered properly rights, the fact that valid legislation disregards or destroys existing contractual rights, does not always transform the regulation into an illegal taking. See Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224 (1986) (holding that private contracts cannot avoid the effects of valid federal legislation); Liberty Mutual Ins. Co. v. Whitehouse, 868 F.Supp. 425, 436 (D.R.I. 1994) (applying the reasoning of Connolly to a Rhode Island workers compensation statute). In determining whether a regulation enacts a compensable taking, the analysis is an ad hoc, factual inquiry into the circumstances of each particular case. McAndrews, supra at 18 (citing Connolly v. Pension Benefit Guarantee Corp., 475 U.S. 211 (1986)). Three factors important to the inquiry are: 1) the economic impact on the property owner; 2) the extent to which the regulation interferes with investment backed expectations; and 3) the character of the interference. Penn Central Transportation Company v. New York City, 438 U.S. 104, 124 (1978); Steinbergh, supra at 742.
‘The hallmark of an unconstitutional taking is, of course, the denial of the economically viable use [of the property].” McAndrews, supra at 18. Section 22 does not deprive Amsat of all economically viable use of its contractual relationship with Lincoln, or deny Amsat access to the premises. Rather, it forces Amsat to compete with local cable companies such as Greater Worcester Cablevision in order to provide the best service possible for tenants at complexes such as Lincoln. The contract still exists, albeit, as a nonexclusive one. Nothing precludes Amsat, if priced competitively, from entering into service agreements with multi-unit complexes.
Looking at the second factor, the interference with reasonable investment backed expectations, the result of Section 22 on Amsat’s agreement with Lincoln is that Amsat is no longer guaranteed the position of sole supplier of television services to the complex. The reasonable expectation of Amsat is a continued relationship with Lincoln and its tenants. Such a relationship has not been prohibited, although the unexpected addition of competition may make it more challenging. Amsat’s expected loss would be of future profits, which alone is not enough to constitute a taking. ‘The loss of future profits — unaccompanied by any physical property restrictions — provides a slender reed upon which to rest a takings claim.” Andrus v. Allard, 444 U.S. 51, 67 (1979) (regulations prohibiting the sale of artifacts using protected eagle feathers held not to be a taking where the regulation did not compel the surrender of artifacts, and there was no physical restraint imposed upon them); Davidson v. Commonwealth, 8 Mass.App.Ct. 541, 551 (1979) (“in the event of a taking requiring compensation . . . compensation ordinarily does not include damages for loss of business”).
As stated above, this is not a case where the regulation has caused a “physical occupation” of Amsat’s property. A crucial factor in Andrus was that the party retained their rights in the property. Id. In the instant case Amsat retains all of its physical property and the ability to continue to provide service to Lincoln. A reduction in the value of the property (here, the contract) is not necessarily equated with a taking. Id.; Flynn v. City of Cambridge, 383 Mass. 152, 161 (1981). Moreover, competition was not totally unexpected, as the exclusivity provision in the contract also provided for a right of first refusal.
*503 The final factor, the character of the interference, is measured by the extent to which governmental action is more akin to a physical invasion or to a necessary readjustment of economic benefits and burdens. Penn Central, supra, at 124; McAndrews, supra at 18. As discussed above, there is no physical invasion or occupation of Amsat’s property resulting from Section 22. The statute instead sets forth a framework which promotes competition for access by eliminating exclusive agreements. The statute reflects a policy decision in providing tenants of complexes access to competitive cable companies, and not subjecting them to the choice of the landlord or owner. Section 22 is a statute that adjusts the benefits and burdens of economic life to promote the common good. It is therefore not a taking.
Because Amsat has not been deprived of the total economic use of its agreement with Lincoln, and has not been otherwise prevented from seeking access by Section 22, the loss of future profits pursuant to the exclusivity of service agreement is not a compensable taking. Neither is Amsat able to be recompensed under the statute, which provides just compensation for the landlord or owner whose property is physically invaded.
CONCLUSION
The exclusivity provision in the contract for service between Amsat and Lincoln Street Realty is contrary to the policy of G.L.c. 166A §22. The purpose of the mandatory access statute is to promote competition and prevent tenants of housing complexes from being a captive audience, subject to the choice of the landlord. For that reason, the exclusivity of service provision, paragraph 15 of the contract between Amsat and Lincoln Realty, is void and unenforceable. Greater Worcester Cablevision, pursuant to the statute, has a right of access to Lincoln Village.
Moreover, operation of G.L.c. 166A §22, which invalidates the exclusivity of service provision, does not constitute a taking of Amsat’s contractual property for which compensation is required. Compensation under the statute is provided for owners of the physical property invaded by the installation of cable under the mandatory access provision. The loss of future profits does not rise to the level of a constitutional taking. For that reason, Lincoln Street Realty and Greater Worcester Cablevision should not be required to indemnify Amsat for the loss of its exclusive contract.
ORDER
For the reasons set forth above, it is hereby ORDERED that third party plaintiffs Lincoln Street Realty and Greater Worcester Cablevision’s motion for summary judgment is ALLOWED.
1.The exclusivity of service clause in the agreement between Lincoln Street Realty and Amsat Cable Limited Partnership III is void and unenforceable under G.L.c. 166A §22.
2. Greater Worcester Cablevision has a statutory right of access to Lincoln Village.
3. Greater Worcester Cablevision and Lincoln Street Realty are not obligated to indemnify Amsat for the loss of revenues resulting solely from the voiding of the exclusivity of service clause.

This memorandum and order pertains solely to the issue of Amsat’s exclusive agreement to provide television services to Lincoln. While it is possible that the contract between Amsat and Lincoln contains easement provisions, the court does not reach the question of the validity of Amsat’s alleged exclusive easement on Lincoln’s premises which may have been breached by Lincoln or occupied by Cablevision, or the damages which may result from such actions. The issue has not been briefed by the parties, and therefore is not addressed by the court.

Section 22, in pertinent part, provides:
No person owning, leasing, controlling, or managing a multiple dwelling unit or units shall prohibit or otherwise prevent an operator from entering such buildings for the purpose of constructing, installing or servicing CATV system facilities if one or more tenants or occupants of a multiple dwelling unit or units have requested such CATV services. A cable television operator shall not make an installation in an individual dwelling unit unless permission has been given by the tenant occupying such unit.

Similar policy reasons were cited as the purpose behind the Connecticut mandatory access law, General Statutes Sec. 16-333a in Amsat Cable Limited Partnership III v. Woodgate, 3 Conn. L. Rptr. 810, 1991 WL 49850 (Conn.Super. Ct.).

It should be noted that the possibility of competition was not unheard between the parties. Paragraph 15 of the agreement, the exclusivity provision, also grants to Amsat the right of first refusal during the term of the agreement.

The statute does not prevent alternative television services from seeking access to multi-unit complexes. In fact, the statute expressly prevents an agreement between operators and owners that would interfere with the existing rights of any tenant or occupant to use master or individual antenna equipment. G.L.c. 166A§22.

Because the agreement between Amsat and Lincoln includes a severability clause at ¶32, the voiding of the exclusivity provision does not disturb the effect of the remaining provisions of the contract, if the contract is determined to be in force.

As stated above, the issue of interference with Amsat’s alleged exclusive easement is not currently before the court.

The Fifth Amendment provides in part:
No person shall... be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation. U.S. CONST. AMEND. V.

Lincoln Street Realty Company. Greater Worcester Cablevision and Lincoln Street Realty were permitted to intervene as third party plaintiffs.