[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

────────────────────

No. 11-11195

────────────────────

D.C. Docket No. 8:10-cv-01656-RAL-TGW

IBERIABANK,
a Louisiana banking corporation and authorized to do business in the State of
Florida,

Plaintiff - Appellee,

versus

BENEVA 41-I, LLC,
a Florida limited liability company,
BENEVA 41-II, LLC,
a Florida limited liability company,
BENEVA 41-III. LLC, a Florida limited liability company,

Defendants - Appellants.

────────────────────

Appeal from the United States District Court
for the Middle District of Florida

────────────────────

(November 30, 2012)

Before TJOFLAT, MARTIN, and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, we are called upon to determine whether a sublease transferred by the Federal Deposit Insurance Corporation ("FDIC") to Iberiabank after it took over the assets of a failed bank is enforceable despite a clause purporting to terminate the sublease on sale or transfer of the failed bank. The District Court granted summary judgment in favor of Iberiabank, holding that the termination clause was unenforceable against Iberiabank under 12 U.S.C. § 1821(e)(13)(A) (2006),[1] which grants the receiver authority to enforce contracts entered into by the failed bank notwithstanding clauses that purport to terminate the contracts on insolvency or receivership. Beneva appeals that decision, contending that Iberiabank has no authority to enforce the sublease and that, even if it does, the termination clause is enforceable because it does not fall within § 1821(e)(13)(A)'s prohibition on such clauses. Because we find that the FDIC acted within its power to enforce contracts under § 1821(e)(13)(A) and that the

---

[1] In its complaint, Iberiabank cites 12 U.S.C. § 1821(e)(12)(A) (2006) rather than 12 U.S.C. § 1821(e)(13)(A) (2006). The error appears to be the result of a renumbering of the statute that occurred in 2005. As part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, Congress amended the Federal Deposit Insurance Act by adding a new section and renumbering paragraphs (11) through (15) as paragraphs (12) through (16). The District Court also cites § 1821(e)(12)(A) in its order. We will refer to the statutory provision as it is currently numbered, § 1821(e)(13)(A), throughout this opinion, except when discussing a case decided before the renumbering. Beneva's contention that the mistake is an abuse of discretion by the district court is without merit.

2

termination clause is unenforceable against Iberiabank as the FDIC's transferee, we affirm.

In Part I, we recount the facts of the case and the proceedings in the District Court. In Part II, we explain the statutory framework that governs the FDIC's powers when it acts as receiver of a failed bank. We then interpret § 1821(e)(13)(A) as it applies to the disputed sublease.

## I.

### A.

Beneva and Iberiabank became parties to the sublease at issue through a series of assignments. The sublease, which covers premises on which Iberiabank operates a bank branch, was executed on January 3, 1979, by Casto Developers as sublessor and National Bank Gulf Gate as sublessee. The term of the sublease was twenty years, with an option to renew for ten successive periods of five years each. The rent for each renewal period was set at 110% of the rent paid during the preceding term. The sublease provided that on termination of the agreement, the sublessee would surrender the premises to the sublessor.

Sometime between 1979 and 2002, National Bank Gulf Gate was merged into or acquired by SunTrust Bank. On April 26, 2002, SunTrust assigned its interests in the sublease to Orion Bank. Orion paid SunTrust $1,051,000 for the

improvements on the property.  Casto Investments Company, Ltd., successor-in-interest to Casto Developers, signed a Memorandum of Lease with Orion.  At that time, the original term of twenty years had run and the current term of the lease was for five years commencing June 3, 1999.  An option to renew for nine additional five-year periods remained.

On January 8, 2009, Orion was notified that Casto had sold the subleased property to Beneva.  On August 31, 2009, Beneva and Orion entered into an amendment to the sublease.  The amendment provided that the sublease term would be extended to June 3, 2049, the expiration date of the final five-year extension in the original sublease.  Orion agreed to pay Beneva $1.75 million as a "lease extension incentive."[2]  The amendment also contained a termination clause, which is at issue in this case.  It provides: "3. Termination. Sublessor shall have the right to terminate the Sub-lease if (i) Orion is sold and/or transferred to another banking institution, or (ii) Orion sells and/or transfers all or substantially all of its assets."

On November 13, 2009, the Florida Office of Financial Regulation closed Orion and appointed the FDIC receiver, with authorization to take charge and

---

[2] It is unclear from the record why Beneva and Orion executed the Amendment, since the expiration date and rent did not change, and why Orion agreed to pay Beneva $1.75 million.

possession of all assets of Orion.[3]  That same day, the FDIC and Iberiabank

entered into a Purchase and Assumption Agreement under which Iberiabank

agreed to purchase Orion's assets and assume certain of its liabilities, duties, and

obligations.  On June 29, 2010, Beneva notified Iberiabank that, pursuant to the

termination clause contained in the amendment entered into by Iberiabank's

predecessor, Orion, Beneva was exercising its right to terminate the sublease.  The

notice stated, "This provision was specifically negotiated to allow Sublessor the

right to terminate the Sublease in events such as when Orion was closed by the

FDIC and its assets were transferred to Iberiabank."  Beneva gave Iberiabank one

year to vacate the premises, as provided by the sublease.

## B.

Iberiabank brought this declaratory judgment action in the District Court for

---

[3]  The Florida Office of Financial Regulation took possession of Orion and appointed the FDIC as receiver pursuant to Fla. Stat. §§ 658.79, 658.80, and 658.81 (2009).

Under § 658.79, the Office of Financial Regulation may designate a receiver to take charge of the assets and affairs of a bank "[w]henever the office has reason to conclude, based upon the reports furnished to it by a state bank or trust company examiner or upon other satisfactory evidence, that any state bank or trust company: (1) Is insolvent or imminently insolvent."

Under § 658.80(2), "[t]he Federal Deposit Insurance Corporation or any appropriate federal agency shall be appointed by the office as receiver or liquidator of any state bank, the deposits of which are to any extent insured by the corporation."

Section 658.81 provides for notice and court confirmation of appointment of the receiver after a hearing.  Florida Circuit Judge Hugh Hayes found that the Office had shown that Orion was imminently insolvent as defined in § 655.005(1)(k) and entered an order confirming appointment of the FDIC on November 13, 2009.

the Middle District of Florida on July 26, 2010.  It asked the court to rule that the termination clause was unenforceable under 12 U.S.C. § 1821(e)(13)(A) and thus the sublease was still in effect without the termination clause.[4]  Iberiabank also asked for attorney's fees and costs as provided in the sublease.

On January 25, 2011, before discovery had been completed, Iberiabank moved for summary judgment.  The District Court entered judgment in favor of Iberiabank on February 11, 2011.  It concluded that the FDIC had "the absolute right to assume the sublease and transfer it to the Plaintiff," and that the termination clause operated as an ipso facto clause[5] and was therefore

---

[4] This court has jurisdiction over this case under 28 U.S.C. § 1331.  In a declaratory judgment action, the court normally looks to whether "the cause of action anticipated by the declaratory judgment plaintiff arises under federal law."  Hudson Ins. Co. v. Am. Elec. Corp., 957 F.2d 826, 828 (11th Cir. 1992).  Although the anticipated cause of action here is a state contract claim, resolution of the dispute requires interpretation of a substantial federal issue.  See id. at 829 (11th Cir. 1992) (quoting Franchise Tax Bd. V. Construction Laborers Vacation Trust, 463 U.S. 1, 28, 103 S. Ct. 2841, 2856, 77 L. Ed. 2d 420 (1983)) ("[S]tate-created causes of action can sometimes arise under federal law when the potential state court plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." (internal quotation marks omitted)).  Even if the federal issue would not appear on the face of a well-pleaded complaint by Beneva, but rather as a defense by Iberiabank, Iberiabank likely could bring its own state contract claim, which would necessarily raise a federal question.  See Grable & Sons Metal Prods., Inc v. Darue Eng. & Mfg, 545 U.S. 308, 315, 125 S. Ct. 2363, 2368, 162 L. Ed. 2d 257 (2005) (finding jurisdiction under § 1331 when plaintiff brought quiet title action that turned on a federal tax provision: "[the meaning of the federal tax provision] appears to be the only legal and factual issue contested in the case. [It] is an important issue of federal law that sensibly belongs in a federal court. . . . [B]ecause it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a miscroscopic effect on the federal-state division of labor.").

[5] An ipso facto clause is a clause that provides the consequences if a certain event occurs.  Section 1821(e)(13)(A)'s prohibition on ipso facto clauses is analogous to the unenforceability of

6

unenforceable against the successor-in-interest to the FDIC under 12 U.S.C.

§ 1821(e)(13)(A).  The court opined that the termination clause would render

Orion's assets "worthless," thus destroying the FDIC's ability to sell the failed

bank's assets.

This appeal followed.  Beneva argues, <u>inter alia</u>,[6] that summary judgment in

favor of Iberiabank should be reversed because Iberiabank has no right to enforce

the sublease and, even if it does, the termination clause is not an ipso facto clause

and is thus enforceable against Iberiabank.[7]

_____

ipso facto clauses in the bankruptcy context.  In bankruptcy, an ipso facto clause provides the consequences, such as termination of a contract, upon insolvency or filing of a bankruptcy petition.  Under 11 U.S.C. § 365(b)(2), ipso facto clauses are not enforceable against the trustee.

[6] Beneva also argues that the district court abused its discretion in granting summary judgment without requiring the parties to narrow the factual issues as required by the court's case management order.  The argument is without merit.

[7] Beneva also argues that the District Court abused its discretion in granting attorney's fees to Iberiabank because there is no statutory authority for a grant of fees under the Declaratory Judgment Act.  Iberiabank's request for fees was based on a clause in the sublease, however.  Section 16.04 of the sublease provides:

> In case suit shall be brought by Sub-lessor for the recovery of possession of the Demised Premises or for the recovery of rent or because of the breach of any covenant by the Sub-lessee and if the Sub-lessor is successful in such litigation, then the Sub-lessee shall pay all costs of said litigation including a reasonable attorney's fee; if unsuccessful, the Sub-lessor shall pay to the Sub-lessee all costs of said litigation including a reasonable attorney's fee incurred by sub-lessee in the defense thereof. In case suit shall be brought by the Sub-lessee because of the breach of any covenant by Sub-lessor and if the Sub-lessor is successful in such litigation, then the Sub-lessee shall pay all costs of said litigation, including a reasonable attorney's fee.

The District Court, in granting summary judgment, reserved jurisdiction on the matter of attorney's fees and directed the parties to engage in good faith negotiations to resolve the amount

II.

We review a district court's grant of summary judgment de novo. Holloman v. Mail-Well Corporation, 443 F.3d 832, 836 (11th Cir. 2006). We consider the evidence in the light most favorable to the nonmoving party. Id. Summary judgment is appropriate when there is no genuine issue of material fact and the evidence compels judgment as a matter of law in favor of the moving party. Id. at 836–37.

There appear to be no genuine issues of material fact in this case. Beneva

---

of fees and costs. In its order granting attorney's fees, the court noted that the parties had stipulated to fees of $19,438.50, but that Beneva contended that the court lacked jurisdiction to award the fees because it was divested of jurisdiction when Beneva filed its notice of appeal.

Although the language of Section 16.04 does not provide for fees in the event that the sublessee brings a declaratory judgment action, Beneva has waived any claim about the language of the contract clause by stipulating to the amount of fees owed. See Charter Co. v. United States, 971 F.2d 1576, 1582 (11th Cir. 1992) ("Having induced the court to rely on a particular erroneous proposition of law or fact, a party in the normal case may not at a later state of the case use the error to set aside the immediate consequence of the error.").

We also note that Beneva's jurisdiction argument fails. Filing an appeal does not divest a district court of jurisdiction to decide the issue of attorney's fees. Rather, Beneva's appeal was premature when filed because the court had not yet entered judgment on attorney's fees. In this circuit, "a request for attorney's fees pursuant to a contractual clause is considered a substantive issue; and an order that leaves a substantive fees issue pending cannot be 'final.'" Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc., 312 F.3d 1349, 1355 (11th Cir. 2002). A premature appeal may be cured, however, by a subsequent order terminating the litigation. Norman v. Hous. Auth. of Montgomery, 836. F.2d 1292, 1295–96 (11th Cir. 1988) (citing Bank South Leasing, Inc. v. Williams, 778 F.2d 704, 705 (11th Cir. 1985)) ("[A] notice of appeal filed after judgment was rendered but before the attorney's fee issue was decided was premature, but . . . a subsequent order deciding the attorney's fees issue cured the premature notice."). Because the district court entered an order on attorney's fees one week after the notice of appeal was filed, Beneva's notice of appeal is timely.

8

and Iberiabank's dispute involves construction of § 1821(e)(13)(A) and application of the statute to the sublease and amendment at issue, which are matters of law appropriate for summary judgment. We first describe the statutory background on which the issues play out before turning to the merits of the case.

A.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (codified as amended in scattered sections of 12 U.S.C.), was enacted to strengthen regulation of the nation's financial system in the wake of the savings and loan crisis of the 1980s.[8] The Act provides a mechanism for dealing with financially distressed banks in a way that preserves their going-concern value. McAndrews v. Fleet Bank of Massachusetts, N.A., 989 F.2d 13, 15 (1st Cir. 1993). It grants the FDIC broad powers under 12 U.S.C. § 1821 to manage the affairs of insolvent banks as receiver or conservator.

When the FDIC is appointed conservator or receiver, it succeeds to "all rights, titles, powers, and privileges of the insured depository institution." § 1821(d)(2)(A)(i). It may operate the institution, § 1821(d)(2)(B), or it may "transfer any asset or liability of the institution in default . . . without any

---

[8] FIRREA amended the Federal Deposit Insurance Act, Pub. L. No. 81-797, 64 Stat. 873 (codified as amended in scattered sections of 12 U.S.C.), which was enacted in 1950 and governs the FDIC.

approval, assignment, or consent with respect to such transfer,"
§ 1821(d)(2)(G)(i)(II).  The FDIC may also "exercise all powers and authorities specifically granted to conservators or receivers, respectively, under this chapter and such incidental powers as shall be necessary to carry out such powers."
§ 1821(d)(2)(J)(i)

The FDIC's powers with respect to contracts entered into before its appointment as conservator or receiver are provided in § 1821(e).  The receiver has the authority to repudiate or disaffirm any contract or lease to which the depository institution is a party if the receiver determines that it would be burdensome and that repudiation would "promote the orderly administration of the institution's affairs."  § 1821(e)(1).[9]  Conversely, § 1821(e)(13)(A) provides that the FDIC may enforce contracts entered into by the depository institution:

> The conservator or receiver may enforce any contract, other than a director's or officer's liability insurance contract or a depository institution bond, entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or appointment of or the exercise of rights or powers by a conservator or receiver.

---

[9]  A party who has been harmed by repudiation may receive actual compensatory damages, § 1821(e)(3), but the Act specifically provides that a lessor may not receive damages if the FDIC repudiates a lease under which the institution is the lessee.

10

It is § 1821(e)(13)(A) that is at issue in this case.  Beneva argues that

Iberiabank has no power to enforce the sublease under § 1821(e)(13)(A) because

the statute grants that power only to a conservator or receiver.[10]  Beneva further

argues that, even if Iberiabank does have the power to enforce the sublease, the

termination clause bars enforcement of the sublease because the termination clause

does not fall within the language of § 1821(e)(13)(A).

Although the District Court determined that Iberiabank, as the FDIC's

successor-in-interest, could enforce the contract, we do not agree that Iberiabank is

attempting to enforce the contract.  If the contract remains in effect, it is because

the FDIC enforced it when it transferred Orion's assets to Iberiabank.  We thus

look to the record to determine whether the FDIC enforced the contract.

B.

When the Florida Office of Financial Regulation appointed the FDIC

receiver of Orion, it authorized the FDIC to "take charge and possession of all

assets and affairs of Orion Bank."  Section 658.82(1) of the Florida statutes

provides that when the FDIC is appointed receiver, "it may proceed independently

---

[10]  Beneva also argues that § 1821(e)(13)(A) does not authorize a private cause of action by Iberiabank against Beneva.  This argument is irrelevant.  Iberiabank has brought a declaratory judgment action in anticipation of a state ejectment action by Beneva.  Interpretation of § 1821(e)(13)(A) is necessary to determine Iberiabank's and Beneva's rights under the sublease, construction of which is governed by state law.

with the receivership pursuant to its rules and regulations."[11]  Under 12 U.S.C.

§ 1821(d)(2)(A)(i), the FDIC as receiver succeeded by operation of law to "all

rights, titles, powers, and privileges of the insured depository institution."  The

FDIC thus took possession of the sublease as an asset and right of Orion pursuant

to the FDIC's powers as receiver under state and federal law.

The same day the FDIC took possession of Orion, it transferred Orion's

assets, liabilities, and obligations to Iberiabank pursuant to its power under

§ 1821(d)(2)(G)(i)(II) to "transfer any asset or liability of the institution in

default."  The sublease was not listed as an asset in the agreement that governed

the transfer.[12]  Instead, the FDIC granted Iberiabank an option to have the lease of

any occupied property assigned to Iberiabank.[13]  The agreement provided that, if

---

[11] 12 U.S.C. § 1821 likewise provides that the FDIC may accept appointment as receiver by an appropriate State supervisor of an insured State depository institution and that the FDIC will enjoy the powers of both state law and § 1821.  § 1821(c)(3)(A)–(B).

[12] In fact, the Agreement specifically excluded the sublease.  Section 3.5(f), which listed assets not purchased by the assuming bank, provides, "The Assuming Bank does not purchase, acquire or assume . . . leased or owned Bank Premises . . . provided that the Assuming Bank does obtain an option under Section 4.6, Section 4.7 or Section 4.8, as the case may be, with respect thereto."  The sublease was likewise not listed on Schedule 3.2, though it is listed as an asset subject to an option to purchase.

[13] The option was contained in Section 4.6 of the Agreement, "Agreement with Respect to Bank Premises."  It provides in relevant part:
(b) Option to Lease.  The Receiver hereby grants to the Assuming Bank an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to cause the Receiver to assign to the Assuming Bank any or all leases for leased Bank Premises, if any, which have been continuously occupied by the Assuming Bank from Bank Closing to the date it elects to accept an assignment of

12

the lease could not be assigned, the FDIC would enter into a sublease with the

assuming bank containing the same terms and conditions as the existing lease.[14]

The agreement further provided that, should Iberiabank fail to notify the FDIC that

it wished to exercise the option but continue to occupy the premises for a certain

amount of time, it would be deemed to have assumed the lease.[15]

In assuming the sublease and subsequently transferring it to Iberiabank, the

FDIC was acting within its power to take charge of Orion's assets, to transfer

---

the leases with respect thereto to the extent such leases can be assigned; provided, that the exercise of this option with respect to any lease must be as to all premises or other property subject to the lease.

[14]  Section 4.6(b) continues:
If an assignment cannot be made of any such leases, the Receiver may, in its discretion, enter into subleases with the Assuming Bank containing the same terms and conditions provided under such existing leases for such leased Bank Premises or other property.  The Assuming Bank shall give notice to the Receiver within the option period of its election to accept or not to accept an assignment of any or all leases (or enter into subleases or new leases in lieu thereof).  The Assuming Bank agrees to assume all leases assigned (or enter into subleases or new leases in lieu thereof) pursuant to this Section 4.6.
An anti-assignment provision in the sublease does not affect the FDIC's rights.  When the FDIC was appointed receiver, it succeeded by operation of law to all the assets and rights of Orion, including the sublease, notwithstanding any anti-assignment provision.

[15]  The automatic assumption provision was contained in Section 4.6 of the Agreement.  It provides in relevant part:
(g) Vacating Premises.
(ii) By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 4.6(b), or by occupying such premises after the one hundred eighty (180)-day period specified above in this paragraph (ii), the Assuming Bank shall, at the Receiver's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located).

13

those assets, and to enforce contracts entered into by Orion. The termination clause in the sublease purporting to allow termination on transfer of Orion's assets would have been triggered by the FDIC's takeover of Orion's assets. The FDIC, however, had the power to enforce the lease notwithstanding clauses to the contrary. It must have enforced the sublease when it transferred Orion's assets to Iberiabank; otherwise, the option to lease the occupied premises would have been meaningless. Without the leased premises, the value of Orion's assets would have decreased. The FDIC was thus carrying out its duty under FIRREA to maximize the value of failed banks when it entered into the Purchase and Assumption Agreement and enforced the sublease.

## C.

Notwithstanding the FDIC's power to transfer assets and enforce contracts, Beneva contends that the termination clause is enforceable against the FDIC because it does not expressly condition termination on insolvency or appointment of a conservator or receiver. Iberiabank argues that the termination clause is unenforceable under § 1821(e)(13)(A) because, regardless of whether it contains exact language from the statute, it was triggered by the FDIC's receivership of Orion.

Interpretation of § 1821(e)(13)(A)'s provision barring enforcement of ipso

14

facto clauses against receivers and conservators is a matter of first impression in

this circuit.  In fact, few courts have addressed § 1821(e)(13)(A).[16]  To resolve this

dispute, we thus turn to settled principles of statutory interpretation.  We look first

to the text of the statute.  United States v. DBB, Inc., 180 F.3d 1277, 1281 (11th

Cir. 1999) ("The starting point for all statutory interpretation is the language of the

statute itself.").  If the text of the statute is unambiguous, we need look no further.

We will look beyond the plain language of the statute to evidence of congressional

intent only if the statute's language is ambiguous; applying the plain meaning of

---

[16]  Three Courts of Appeals have decided cases in which § 1821(e)(13)(A) (or its predecessor, § 1821(e)(12)(A)) is referenced.  None of the cases is applicable here.

The District Court in this case relied on McAndrews v. New Bank of New England, N.A., 796 F.Supp. 613 (D. Mass. 1992), aff'd sub nom. McAndrews v. Fleet Bank of Massachusetts, N.A., 989 F.2d 13 (1st Cir. 1993), in holding that the Termination Clause is unenforceable against the FDIC or its successor-in-interest.  But in that case, the FDIC was a party to the action, and the court did not engage in interpretation of § 1821(e)(12)(A).  Instead, the First Circuit held that applying the statute to a contract entered into before FIRREA was enacted did not constitute an impermissible retroactive application, nor did it constitute an unconstitutional taking.

In Resolution Trust Corp. v. District of Columbia, 78 F.3d 606 (D.C. Cir. 1996), the RTC challenged the District of Columbia's invocation of a "bankruptcy clause" providing for termination of a lease of office space if the lessor "failed in business."  The District Court for the District of Columbia had determined that if the bankruptcy clause applied, it would be overridden by § 1821(e)(12)(A).  The Court of Appeals for the D.C. Circuit did not reach the issue, however, because it determined that an estoppel certificate signed by the District of Columbia prevented it from invoking the bankruptcy clause when the lessor went into receivership.

The Sixth Circuit has decided two cases in which § 1821(e)(13)(A)'s predecessor is mentioned.  FDIC v. Aetna Cas. and Sur. Co., 903 F.2d 1073 (6th Cir. 1990), involved a provision in bankers blanket bonds that provided for termination of coverage on takeover by the FDIC.  The court noted that § 1821(e)(12)(A) specifically excludes fidelity insurance from its prohibitions, so the provision in the bonds could not be against public policy.  RTC v. Cheshire Mgmt Co., 18 F.3d 330 (6th Cir. 1994), involved a qualified financial contract, which is governed by a separate provision, § 1821(e)(8)(A).

15

the statute would lead to an absurd result; or there is clear evidence of contrary legislative intent. Id.

Under § 1821(e)(13)(A), the FDIC may enforce contracts entered into by the depository institution "notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of or the exercise of rights or powers by a conservator or receiver." The termination clause at issue provides for termination if "Orion is sold and/or transferred to another banking institution." The clause does not mention insolvency or appointment of a receiver or conservator, and it applies in contexts outside insolvency. There is nothing in § 1821(e)(13)(A), however, that premises unenforceability on explicit reference to insolvency or conservatorship or receivership. Although the termination clause does not incorporate the statutory language "exercise of the rights of the receiver," the termination clause's trigger is the exercise of one of the rights of the receiver—the right to succeed to all rights and title of Orion pursuant to § 1821(d)(2)(A)(1) or to transfer or sell Orion's assets pursuant to § 1821(d)(2)(G)(i)(II).

Even presuming ambiguity as to whether § 1821(e)(13)(A) applies only to ipso facto clauses that include specific statutory language, our reading of the statute comports with Congress's stated intent in enacting FIRREA and its grant of

16

broad powers to the FDIC to manage the affairs of failing banks under § 1821.

Congress amended § 1821(e)(13)(A) in 2005 to add "or the exercise of rights or powers by" after "the appointment of." Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2006). By broadening the scope of clauses that are unenforceable against the FDIC as receiver, Congress evidenced an intent to strengthen the FDIC's ability to enforce contracts. Were we to hold that the termination clause is enforceable against the FDIC, we would eviscerate § 1821(e)(13)(A). If termination clauses that do not contain the explicit language "on exercise of the rights of the receiver" but are triggered by exercise of those rights are valid, the language added by Congress in 2005 would be rendered toothless. For example, receivership necessarily involves a transfer of assets when the FDIC takes over the failing bank. Contracting parties could thus get around § 1821(e)(13)(A) simply by drafting clauses that provide for termination on sale or transfer of assets. The notice of termination in this case provides evidence that Beneva intended just such a result: "This provision was specifically negotiated to allow Sublessor the right to terminate the sublease in events such as when Orion was closed by the FDIC and its assets were transferred

17

to Iberiabank."[17]

Beneva also argues that the termination clause does not fall within the language of the statute because there are situations outside the insolvency context in which the clause would be enforceable. If Orion's shareholders had simply sold the bank, Beneva would have been able to terminate the sublease under the terms of the amendment. The fact that the termination clause is enforceable in some contexts, however, does not mean that it is enforceable in all contexts. As applied when a bank is in receivership, the Clause operates to terminate upon "exercise of rights or powers by a conservator or receiver," and thus is unenforceable under § 1821(e)(13)(A). The broad scope of the clause does not save it.

Beneva's narrow reading of § 1821(e)(13)(A) is unsupported by the language of the statute and would allow contracting parties to defeat the FDIC's power to enforce contracts simply by drafting termination clauses that do not explicitly mention insolvency or receivership. Given FIRREA's grant of broad powers to the FDIC to manage the affairs and preserve the value of insolvent banks, Congress could not have intended the statute to be construed to allow such a result. We hold that the Termination Clause falls within the language of

---

[17] The notice does not affect our interpretation of the Termination Clause. We point out the language simply to show the effect a narrow reading of the statute would have on contracting parties, who would know full well how to avoid § 1821(e)(13)(A).

18

§ 1821(e)(13)(A) and is therefore unenforceable against the FDIC as receiver of Orion.  The FDIC was acting within its powers when it enforced the sublease notwithstanding the termination clause.  The District Court properly granted summary judgment to Iberiabank, and the sublease between Beneva and Iberiabank remains in effect.[18]

We note that our decision does no injustice to Beneva.  The original sublease was drafted in 1979, before FIRREA was enacted but well after the FDIC was created and imbued with broad powers to manage the affairs of failing banks. Any entity that enters into a lease with a bank, or accepts assignment of such a lease, is on notice that, should the bank fail, the FDIC will have the power to enforce the lease.  Congress granted the FDIC such powers for the health of the banking industry and the benefit of depositors, and Beneva may not skirt § 1821(e)(13)(A) with a narrow reading of the statute.

AFFIRMED

---

[18]  The sublease contains a severability provision, Section 19.01, which provides that if any term or provision of the sublease is found to be invalid or unenforceable, the remainder of the sublease will remain in effect.